**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH**

**HERCULES INDUSTRIES, INC.,**

**Plaintiff,**

v.

**YOGAPIPE, INC.,**

**Defendant.**

---

**UMC, INC.**

**Intervenor Plaintiff,**

**v.**

**HERCULES INDUSTRIES, INC, AND YOGAPIPE, INC.,**

**Intervenor Defendants.**

**MEMORANDUM DECISION AND ORDER**

Case No. 2:22-cv-27-DAK-JCB

Judge Dale A. Kimball

Magistrate Judge Jared C. Bennett

This matter is before the court on Plaintiff Hercules Industries, Inc.'s Motion for Summary Judgment [ECF No. 40] and Intervenor UMC, Inc.'s Motion for Summary Judgment [ECF No. 51]. On August 24, 2023, the court held a hearing on the motions. At the hearing, James F. Scherer and Meghan A. Sheridan represented Plaintiff, William J. Akins represented Defendant, and David S. Bridge represented Intervenor UMC. The court took the motion under advisement. After carefully considering the memoranda filed by the parties and the law and facts relevant to the pending motions, the court issues the following Memorandum Decision and Order.

## BACKGROUND

In approximately 2016, YogaPipe began distributing piping material that was sourced from a German manufacturer, WRW Westfaehlische Rohrweke GmbH ("WRW"). In early 2017, YogaPipe began receiving quality-related warranty claims from its customers who purchased WRW-manufactured piping. Most complaints involved burst piping material that resulted from a longitudinal rupture in the piping material along the weld line.

In 2018 and 2019, YogaPipe began communicating with WRW about the repeated reports of piping failures. YogaPipe asked WRW to fix the issues with the piping material, including the welding process, and to provide compensation for the bursts and other claims. WRW's insurance carrier compensated YogaPipe for some of the ruptured and defective piping claims.

Hercules claims that despite YogaPipe's knowledge of the defective piping, in September 2019, YogaPipe sold Hercules piping it purchased from WRW. YogaPipe claims, however, that WRW informed it that any problem with the piping was resolved. That same month, Hercules sold the WRW piping from YogaPipe to Utah Mechanical Contractors, Inc. ("UMC"). UMC used the piping material in an HVAC system it installed in a new apartment complex in Salt Lake City, Utah, known as the "Paxton Avenue Project." Hercules provided YogaPipe's specific training regarding the product to UMC's installers. YogaPipe, however, states that UMC tested the piping for 48 hours at 500lbs of pressure to make sure it passed that testing and inspection, but YogaPipe's installation instructions told UMC to test the piping at 600lbs. Hercules states it had no knowledge of any issues with this piping before purchasing the piping from YogaPipe and reselling it to UMC. Hercules believed the piping was fit for the ordinary purpose for which the products were sold.

YogaPipe's Chief Financial Officer and 30(b)(6) corporate representative, Larry Biricz,

testified that all the product YogaPipe sold to Hercules in September 2019, and Hercules resold to UMC, was from WRW. YogaPipe now disputes that testimony, claiming that Hercules has photographs of removed piping from the Paxton Avenue Project made by another German manufacturer, Hewing, that YogaPipe was also selling at that time. But Biricz previously testified that YogaPipe did not get its first Hewing shipment until later in the year, approximately December 2019. YogaPipe also testified that it could check its database to confirm this and, to date, YogaPipe has not provided information contradicting Biricz's testimony. YogaPipe could provide hard evidence to controvert its own witness, but it has not. Moreover, Hercules clarified that the piping photograph that Biricz identified as being from Hewing was a photograph of exemplar piping that Hercules originally forwarded to Fristche, not the piping from the Paxton Avenue Project.

Hercules claims that shortly after completion of the apartment building complex, the YogaPipe which UMC installed in the complex failed, causing extensive damage to the complex. YogaPipe disputes this statement, arguing that there is no cited evidence to support it. UMC expended substantial sums remediating the damage to the complex caused by the defective piping. YogaPipe, however, takes issue with UMC's alleged damages because it not only repaired damaged piping but also removed and replaced undamaged piping. UMC testified that the pipes failed because of bursting in multiple places. YogaPipe, however, points out that not all piping failed—the piping had a 20% failure rate. However, UMC decided to remove and replace all the piping because the piping was in use in occupied units in the building and there was a known potential for future bursts.

UMC submitted a warranty claim to YogaPipe on October 1, 2020, claiming piping failures in multiple units. UMC asserted claims against Hercules and YogaPipe for approximately

$570,000, which it claims were its expenses incurred in remediating the damage to the Paxton Avenue Project. Hercules paid UMC $318,849.68 toward settling UMC's claim for the defective YogaPipe piping. YogaPipe told UMC that it needed more information to substantiate the claims. YogaPipe asked for backup information with pictures to substantiate the invoices and information UMC submitted. UMC again demanded payment on October 29, 2020. Hercules and UMC both demanded payment in November 2020. YogaPipe states that at this same time, UMC was discarding all piping removed from the building. Hercules was unable to find any burst piping. YogaPipe contends that UMC has no documentation showing that the undamaged piping was defective and would have burst. UMC did not test any of the piping that it removed from the building. YogaPipe claims that Hercules has no knowledge, other than what UMC told it, that the piping actually burst. Hercules did not investigate the appropriateness of UMC's claimed damages. According to YogaPipe, Hercules paid UMC a portion of UMC's invoices without investigating the charges because UMC is a significant costumer of Hercules and Hercules wanted to take care of them, regardless of what YogaPipe was providing, to protect their relationship with them.

YogaPipe no longer purchases piping from WRW. In late 2019, YogaPipe started marketing and selling Hewing piping from a different German manufacturer. Biricz testified that the reason for the transition was that WRW piping was experiencing too many problems.

In 2020, WRW filed for bankruptcy protection in German courts, and it remains pending. YogaPipe and a related Canadian entity, ES Gallagher Sales Limited, are pursuing warranty and insurance claims against WRW for the defective piping, against WRW's insurer in Germany, and against YogaPipe's insurer in the United States. Andrew Gallagher holds a majority interest in YogaPipe and ES Gallagher, and the claims ES Gallagher are pursuing in ES Gallagher's name are

for both entities. ES Gallagher and YogaPipe have an agreement where ES Gallagher assigns all proceeds related to defective YogaPipe that are obtained from WRW through the German proceedings to YogaPipe.

ES Gallagher, on behalf of YogaPipe, filed a Petition in Independent Evidentiary Proceedings in a German court requesting that the German court retain an independent expert to examine the YogaPipe piping material and answer a series of technical questions regarding the piping. In that Petition, ES Gallagher is claiming damages from WRW for providing defective pipes in the current amount of EUR 1,833,799.98, which is an estimate of claims brought by injured parties against ES Gallagher and YogaPipe. The Petition further states that all pipes from the production years 2017, 2018, and 2019 were defective on account of manufacturing errors. Specifically, the welding seams on the aluminum layers of the pipes were not manufactured properly and that led to pipes bursting in operation. Biricz testified on behalf of YogaPipe that YogaPipe's position was the same as ES Gallagher's at the time of the 30(b)(6) deposition.

In the WRW insolvency proceeding, YogaPipe submitted UMC's reimbursement requests for defective YogaPipe and remediations in the Paxton Avenue Project, in the amount of $17,100.18. Biricz testified that YogaPipe submitted this claim on behalf of Hercules and UMC in this amount as a placeholder and it expects to supplement the claim with additional UMC reimbursement requests. YogaPipe asserts that E.S. Gallagher's inclusion of UMC's reimbursement request in the German proceeding was done as a "placeholder" before it claimed in this litigation that some of the piping was Hewing and before it knew that UMC had destroyed the subject piping after making a claim against YogaPipe.

By submitting the Paxton Avenue claim in the WRW insolvency proceeding, Hercules contends that YogaPipe is claiming the Paxton Avenue claim involves WRW's defective piping.

YogaPipe, however, states that ES Gallagher's allegations in the German proceeding do not constitute judicial admissions by YogaPipe. The two entities have corporate independence. However, Biricz testified that ES Gallagher submitted the claims in the insolvency proceedings on behalf of YogaPipe.

In this action, Hercules brought claims against YogaPipe for breach of implied warranty for selling the defective piping to Hercules and indemnity with respect to UMC's damages. UMC intervened in this action bringing claims against Hercules and YogaPipe. Hercules asserts that YogaPipe is the party liable for UMC's damages. YogaPipe disputes that because WRW piping is believed to have a "welding problem," it necessarily means that the piping was defectively manufactured. Hercules admits that the allegedly burst piping was not examined to determine if it had a defect in a longitudinal seam. The piping material that had not burst that UMC removed has also not been examined by anyone to determine if it had longitudinal seam weld problems. It claims that its witness' deposition testimony that the piping was defective does not prove that the piping was defective.

**DISCUSSION**

**Hercules' and UMC's Motions for Summary Judgment**

Hercules moves for summary judgment on its claims against YogaPipe for breach of implied warranty and indemnity and seeks an order requiring YogaPipe to pay UMC's remaining damage claims for allegedly defective YogaPipe and to reimburse Hercules for the amount it already paid UMC for the allegedly defective YogaPipe. UMC incorporates by reference the facts and argument in Hercules' Motion for Summary Judgment because the same facts and law apply to UMC's claims against YogaPipe and the parties seek the same remedies.

**1. Breach of Implied Warranty Claim**

Hercules and UMC seek summary judgment on their breach of implied warranties claims against YogaPipe, arguing that YogaPipe has no evidence that can overcome its admissions that the piping at issue in this case was defective. "The tort claim for breach of implied warranty has largely been subsumed into the doctrine of strict products liability." *Kirkbride v. Terex USA, LLC*, 798 F.3d 1343, 1353 (10th Cir. 2015). "'Because this is a diversity case,'" the court applies "'the substantive tort law of Utah.'" *Id.* at 1348 (quoting *Brown v. Sears, Roebuck & Co.*, 328 F.3d 1274, 1278 (10th Cir. 2003)). Utah courts have stated that the elements of a strict product liability claim and an implied warranty of merchantability claim "are essentially the same." *Id.* at 1354; *see Straub v. Fisher & Paykel Health* Care, 990 P.2d 384, 389 (Utah 1999) (recognizing "the elements of strict and breach of warranty 'are essentially the same.'"); *Burns v. Cannondale Bicycle Co.*, 876 P.2d 415, 416 (Utah Ct. App. 1994) ("Insofar as Burns's claim for breach of the implied warranty of merchantability is concerned, no separate analysis is required since it is essentially the same as a products liability claim").

To succeed on a manufacturing defect claim, "a plaintiff must prove that (1) the manufacturing defect made the product unreasonably dangerous, (2) the defect was present at the time of the product's sale, and (3) the defect caused the plaintiff's injury." *Kirkbride*, 798 F.3d at 1354 (citing *Schaerrer v. Stewart's Plaza Pharmacy, Inc.*, 79 P.3d 922, 928 (Utah 2003)). A product is "unreasonably dangerous" if it "was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer." Utah Code Ann. § 78B-6-702; *see also* § 78B-6-703 (unreasonably dangerous

to a consumer's property).

On behalf of YogaPipe, ES Gallagher asserted in its Petition in the German court that all pipes bought from WRW from 2017-19 were defective on account of manufacturing errors. YogaPipe also asserted that the welding seams on the aluminum layers of the pipes were not manufactured properly despite multiple adjustments to the manufacturing process, such that these aluminum layers were not welded accurately and that this led to countless pipes bursting during operation. YogaPipe's 30(b)(6) deponent and CFO, Biricz, testified that YogaPipe agreed with all of EG Gallagher's assertions in the German proceeding. Biricz also testified that all the pipes Hercules purchased from YogaPipe in September 2019 were from WRW and that YogaPipe did not purchase piping from another German manufacturer until December 2019. The WRW piping that YogaPipe sold to Hercules is the piping Hercules sold to UMC and UMC used in the Paxton Avenue Project.

As an initial matter, YogaPipe asserts that it has not made any judicial admissions through ES Gallagher. YogaPipe contends that, without judicial admissions, Hercules has no proof of a manufacturing defect or causation necessary to prove Hercules' claims. Hercules points to a German pleading filed by ES Gallagher, but YogaPipe asserts that ES Gallagher's allegations in Germany are not YogaPipe's judicial admissions here. ES Gallagher formally assigned any proceeds ES Gallagher may recover in the German proceeding to YogaPipe, but that assignment states that YogaPipe is not a partner or joint venture with ES Gallagher.

YogaPipe also argues that the court cannot consider Biricz's deposition testimony as judicial admissions either. Hercules asked Biricz if YogaPipe adopted ES Gallagher's German allegations as truth in this case, and he stated that YogaPipe's position was the same as ES Gallaghers. YogaPipe claims that Biricz's testimony does not transform ES Gallagher's German

allegations into judicial admissions.

YogaPipe agrees that when a party testifying in a deposition admits a fact that is adverse to a claim or defense, it is generally preferable to treat that testimony as an ordinary evidentiary admission. *See Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). YogaPipe also asserts that if the court considers ES Gallagher's allegations in the German proceeding to be relevant in this action, they are ordinary evidentiary admissions that are inconclusive and can be controverted and explained in this case. *Asarco, LLC v. Noranda Mining, Inc.*, 844 F.3d 1201, 1212 n.3 (10th Cir. 2017).

Hercules states that it is not arguing that ES Gallagher's judicial admissions are conclusive judicial admissions in this case. But Hercules argues that YogaPipe's evidentiary admissions are enough to prove the piping was more likely than not defective, the necessary standard for summary judgment on its implied warranties claim. Biricz, YogaPipe's CFO and 30(b)(6) corporate representative, testified that "all pipes from the production years 2017, 2018, and 2019 were defective on account of manufacturing errors." He also testified that YogaPipe's position is that "the welding seams on the aluminum layers of the pipes were not manufactured properly despite multiple adjustments to the manufacturing process, such that these aluminum layers were not welded accurately. This led to and is leading to countless pipes in operation bursting." Biricz further testified that all WRW piping had this known welding issue.

UMC testified that the pipes failed as a result of bursting in multiple places. YogaPipe testified that all the piping at the Paxton Avenue project was the admittedly defective WRW piping. YogaPipe testified that it did not get its first shipment of Hewing piping until December 2019. YogaPipe also testified that it could check its database to confirm this, and to date, YogaPipe has not provided information otherwise. Hercules clarified that a photograph it produced in

discovery of Hewing piping is unrelated to the Paxton Avenue Project. YogaPipe has claimed the photograph may show that Hewing piping was at the Paxton Avenue Project, but Hercules clarified that the photo was of exemplar piping that Hercules originally forwarded to Fritsche and was not a picture of the piping from the Paxton Avenue Project.

To counter UMC's testimony, Hercules' testimony, and its own CFO's testimony, YogaPipe needs to submit admissible evidence at the summary judgment stage. Although the court must "view the evidence and draw any inference in a light most favorable to the party opposing summary judgment, …that party must identify sufficient evidence which would require submission of the case to a jury." *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Id.* at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

YogaPipe has not produced any evidence to controvert Hercules' evidence. YogaPipe cannot merely state that its CFO was asserting incorrect information in his deposition. YogaPipe has not asked to cure his deposition or provided an affidavit changing his testimony or calling its accuracy into question. Biricz submitted an additional declaration that he was not aware of the specific defects in piping sold to Hercules, but he did not change his testimony about his knowledge of the history of defects YogaPipe knew WRW was having with its piping. His additional declaration also vaguely states that he was shown a picture of Hewing piping. He does

not state in the declaration that the picture was Hewing piping at the Paxton Avenue Project. His declaration does not contradict Hercules' testimony that the picture is unrelated to the present dispute. Despite its own record evidence, it suggests that not all the piping at the Paxton Avenue Project was piping YogaPipe got from WRW. But its own CFO stated that all the piping was from WRW, that YogaPipe did not get piping from a different source until later, and that a photograph YogaPipe relies on to support the suggestion that Hewing piping may have been used at the Paxton Avenue Project is not related to the Paxton Avenue Project. YogaPipe has not presented any records demonstrating that it sold Hercules Hewing piping in September 2019 or that it began selling Hewing piping before December 2019. YogaPipe does not have a witness to testify that the picture of Hewing piping is piping at the Paxton Avenue project. YogaPipe makes speculative assertions that are not based on any evidence. Arguments and speculation from counsel are not evidence.

YogaPipe claims that summary judgment is inappropriate because the defective WRW piping and the rest of the WRW piping at the Paxton Avenue Project was removed without testing it. But the failure to test the piping does not controvert Biricz's testimony on behalf of YogaPipe that he personally knew of the defects WRW was having with its piping, the piping YogaPipe sold to Hercules and Hercules sold to UMC was all WRW piping, and it was that known defect in the WRW piping that caused the pipes to burst at the Paxton Avenue Project. UMC testified from its own first-hand knowledge that the piping burst in multiple places. In response to interrogatories, UMC stated that it was not in possession of any YogaPipe piping materials, but it believed that 365 Paxton, the owner of the building, had possession of some YogaPipe piping materials that remain in use in the walls of the project as well as possession of some of the failed YogaPipe piping materials that were removed. It does not appear that any party followed up on obtaining that

piping. Moreover, UMC responded that it documented a 20% failure rate with the piping on approximately 150 units at the Paxton Avenue Project. UMC may not have tested the piping, but it documented the failure rates of the YogaPipe piping it purchased.

YogaPipe asserts that the failure to test the piping precludes summary judgment, but a mere lack of a certain type of evidence does not preclude summary judgment when the evidence that is before the court demonstrates that no reasonable jury could conclude that the piping was not defective. YogaPipe's current concern or speculation that a fact finder could draw an adverse inference against Hercules and UMC based on the disappearance of the piping is not supported by any record evidence. YogaPipe did not move for a finding of spoliation during discovery or now. There is no evidence before the court that anyone followed up with the 365 Paxton owners about their possession of some of the subject piping despite UMC's interrogatory response stating it believed the owners had some. There is evidence that Hercules had some WRW piping from the same batch that it was having tested. Again, there is no evidence before the court about the results of that testing or any party following up with that investigation. YogaPipe had ample opportunity to follow up with these lines of investigation if it wanted actual evidence to controvert its own evidentiary admissions.

YogaPipe also takes issue with the fact that UMC tested the WRW piping at 500lbs of pressure instead of 600lbs, but it does not provide any evidence demonstrating how this relates to the product's alleged defect. Biricz states in his supplemental declaration that YogaPipe's installation instructions advised UMC to test the piping at 600 psi if the piping was to be used on a heat pump. But his declaration does not state that testing the piping at 500lbs would be an alternative cause of the defect. YogaPipe also does not provide an expert or other evidence that would explain the relevance of only testing the piping at 500lbs. There is, therefore, nothing before

the court that would indicate that this failure to follow the installation instructions related in any way to the piping defect issue.

YogaPipe also argues that Hercules' and UMC's testimony show genuine issues of material fact that preclude summary judgment because Hercules and UMC witnesses did not know for sure whose piping was installed in the building. But Biricz testified that he knew what piping YogaPipe sold to Hercules and Hercules sold to UMC. Hercules' and UMC's witnesses alleged failure to testify to that question does not controvert Biricz's testimony. YogaPipe could provide actual documentation from its business records to refute his testimony, but it has not done so. YogaPipe also states that Hercules testified that WRW piping did not fail with 20 to 30 of its other customers who bought YogaPipe piping. But this testimony as to other projects has no relevance to the project at issue. Even if the court could try to view this evidence in the light most favorably to YogaPipe, all that it demonstrates is that piping failures have not occurred for other customers or such failures have not occurred yet. It does not contradict or disprove Biricz testimony regarding the failures at issue in this case. YogaPipe also appears to question UMC's business decision to remove all the WRW piping at the Paxton Avenue Project before any additional problems occurred. UMC's 'business decision" demonstrates the concern UMC had as to the product's safety. It does not support a finding that the product was not defective or weigh against summary judgment.

Proof of a manufacturing defect requires Hercules and UMC to prove that (1) the manufacturing defect made the product unreasonably dangerous, (2) that defect was present at the time of the product's sale, and (3) the defect caused the plaintiff's injury. *Kirkbride*, 798 F.3d at 1351. Utah law does not mandate expert testimony to prove the existence of a manufacturing defect, but it does require specific evidence of a manufacturing defect. *See Taylor v. Cooper Tire*

*& Rubber Co.*, 130 F.3d 1395, 1398 (10th Cir. 1997).

YogaPipe argues that without an expert in this case, one would expect testimony from a non-expert of such quality as to clearly explain how the piping was manufactured in such a way as to lead to the resulting defect. But YogaPipe's own witness explained the manufacturing defect WRW had been experiencing with its piping and the cause of it. Biricz cautioned that he is not an engineer as he was explaining his lay person understanding of piping issues. YogaPipe considers Biricz's testimony speculative, circumstantial evidence, but it only presents arguments to that effect, it does not present any evidence casting doubt on the testimony. YogaPipe states that Hercules is not entitled to summary judgment because it did not go to the effort of getting an engineer to corroborate Biricz's testimony, but YogaPipe also did not go to the effort of getting an expert to refute the evidence before the court. It's obvious from the factual evidence Biricz could provide that for some time YogaPipe had been receiving warranty claims from its customers who purchased WRW piping from YogaPipe. YogaPipe discussed the issues with WRW and even though WRW stated it could fix the issues, YogaPipe knew the history of the piping problem. An expert is not required to opine on the history of a known piping issue.

YogaPipe argues that Hercules and UMC have not proven that a prudent buyer, consumer, or user of the piping in their community would consider the piping to be dangerous to an extent beyond which they would have contemplated. But it is general common sense that customers do not buy piping with the expectation that it will have at least a twenty percent change of bursting in the first year of use. No expert is needed on that issue. UMC testified that there was a twenty percent failure rate and that failure rate caused UMC to remove all the WRW piping from the building for the safety of its residents. A business is not going to go to the time and expense of removing the remaining piping unless it is unreasonably dangerous. That evidence also

demonstrates that the bursting pipes were an objectively dangerous product that YogaPipe's speculations and arguments have not countered. Hercules and UMC were trained on using and installing piping and YogaPipe in particular. Like any ordinary consumers, they did not contemplate that the piping would burst. Hercules and UMC believed it was fit for the ordinary purpose for which such products were sold and of merchantable quality. The court concludes that Hercules and UMC have demonstrated that YogaPipe's product was unreasonably dangerous due to a known and admitted defect and that YogaPipe sold the product to them in that state.

YogaPipe also argues that Hercules' alleged damages are speculative. Hercules relies on UMC for damages, citing UMC's interrogatory answer about its total alleged damages and Hercules' payment of a portion of those. YogaPipe claims that UMC does not know its own damages because it cannot separate the removal and replacement of the allegedly burst piping from the replacement of undamaged piping. After multiple bursts, YogaPipe's assertion that UMC had to keep the remaining piping in the building until it also burst, has no basis in law. UMC made a business and safety decision to remove the piping based on the already high failure rate. YogaPipe, who sold the piping to Hercules in a defective condition that was unreasonably dangerous due to the bursting seams, is subject to liability for the damages caused to Hercules and UMC. Accordingly, the court grants Hercules' and UMC's Motion for Summary Judgment on the breach of implied warranties claim.

**2. Indemnity Claim**

Hercules brings an indemnity claim against YogaPipe because Hercules has already remitted monies to UMC for the damages UMC incurred from the defective YogaPipe piping it installed at the Paxton Avenue Project. "An implied indemnity claim . . . permits a seller of a product to recover its loss from a more culpable seller—typically the manufacturer." *Bylsma v.*

*Willey*, 416 P.3d 595, 2017 UT 85, ¶ 34. This "upstream indemnification" places final responsibility for injuries caused by a defective product on the entity initially responsible for placing that product into the stream of commerce. *Id.*

Given the court's ruling that YogaPipe is responsible for the defect, Hercules is entitled to be indemnified for UMC's losses. YogaPipe admits that there is no question that the indemnity claim arises out of the same factual scenario as the warranty claim. The indemnity claim is based on the same uncontroverted facts regarding the known manufacturing defect of WRW product UMC installed in the Paxton Avenue Project. Because the court has held YogaPipe responsible for the defect, YogaPipe has primary liability for the damages and losses UMC incurred.

Hercules argues that it would be judicially efficient for the court to rule on the indemnity claims at the same time as the breach of warranty claim. Hercules is entitled to be indemnified by YogaPipe for the sums it has already remitted to UMC. YogaPipe, however, argues that the court should deny summary judgment on this indemnity claim because there are genuine issues of material fact.

YogaPipe argues that Hercules' indemnity claim is premature because there has been no finding, judgment, or settlement of liability upon which to shift indemnity from Hercules to YogaPipe. "For an indemnification claim, Utah law requires that the distributors discharge a legal obligation owed to a third party." *Covestar, Inc. v. Cooley, Inc.*, No. 2:01-CV-663-DS, (D. Utah June 1, 2006). The court, however, has just found YogaPipe liable for UMC's breach of warranty damages. Although Hercules' payment to UMC for a portion of its alleged damages was not a settlement nor did it discharge an obligation that Hercules owed to UMC at the time, its prompt payment does not preclude Hercules from being indemnified now that liability is settled.

With respect to damages, YogaPipe's uncontroverted testimony was that all the piping in

the Paxton Avenue Project was WRW and was defective. UMC's damages, and thus Hercules' damages, are not speculative. UMC submitted invoices for all the work to remediate the defective piping. It does not matter if the pipe had not burst yet; it had known defects and was in an occupied building. UMC explained the failure rate at the building to YogaPipe, and that with an occupied building, it could no longer wait for failures to fix the problem. YogaPipe accepted the failed pipe as a defect, agreed to send an insurance company adjustor to manage the situation with UMC, and asked for an estimate for the full costs of replacement. UMC purchased and installed the replacement products to remediate the failing YogaPipe. UMC provided copies of subcontractors' invoices, which clearly show the scope of work and work orders.

Hercules seeks $318,849.68 for the amount of damages it has paid to UMC and UMC seeks $251,150.32 for remaining damages it paid to resolve the claims of the general contractor and owner of the Paxton Avenue Project due to the breach of warranties. YogaPipe also argues that that UMC's damages were not indemnity payments because there was no claim by the general contractor or the property owner against UMC and UMC was not required to pay anyone. But contrary to YogaPipe's assertion, UMC did not just take it upon itself to incur damages for the repair/replacement work. UMC installed the piping, could most efficiently replace the piping, and was required by the general contractor and owner to make the repairs. There is no basis for arguing that UMC should have refused to make the repairs and waited until a court ruled against it to make any repairs.

YogaPipe has not presented any genuine issues of material fact to refute the admitted defective piping and Hercules' and UMC's claimed damages. Other than generalized speculation, YogaPipe has not contested the specific amount of damages that Hercules and UMC are claiming with any legitimate facts or numbers opposing them. As a result, the court grants summary

judgment for Hercules, in the amount of $318,849.68, and UMC, in the amount of $251,150.32, on their respective indemnity claims against YogaPipe.

**CONCLUSION**

Based on the above reasoning, Plaintiff Hercules Industries, Inc.'s Motion for Summary Judgment [ECF No. 40] is GRANTED and Intervenor UMC, Inc.'s Motion for Summary Judgment [ECF No. 51] is GRANTED. The court awards Hercules $318,849.68 on its indemnity claim against YogaPipe and awards UMC $251,150.32 on its indemnity claim against YogaPipe.

DATED this 10th day of October 2023.

BY THE COURT:

DALE A. KIMBALL,
UNITED STATES DISTRICT JUDGE